MARATHON PIPELINE COMPANY,
Petitioner,

v.

NORTHERN PIPELINE CONSTRUC-
TION CO., Respondent.

Civ. No. 4–80–589.

United States District Court,
D. Minnesota,
Fourth Division.

April 23, 1981.
Supplemental Opinion July 24, 1981.

Lindquist & Vennum by Melvin I. Oren-
stein, Minneapolis, Minn., for defendant.

Briggs & Morgan by John Devney, St. Paul, Minn., for plaintiff.

## ORDER

MILES W. LORD, District Judge.

■ The Court, having heard the arguments of counsel and considered the files, briefs, and all relevant material, has concluded that the petitioner's motion to dismiss is meritorious and that the delegation of authority in 28 U.S.C. § 1471 to the Bankruptcy Judges to try cases which are otherwise relegated under the Constitution to Article III judges is an unconstitutional delegation of authority.[1]

Accordingly, IT IS HEREBY ORDERED That the adversary proceeding instituted by Northern Pipeline Construction Co. against Marathon Pipeline pursuant to the provisions of the Bankruptcy Code is dismissed.

IT IS FURTHER ORDERED That a stay of the provisions of this Order is granted pending appeal.

## SUPPLEMENTAL OPINION

This action comes before this Court upon an appeal from an Order of the United States Bankruptcy Court for the District of Minnesota concluding that no constitutional infirmity invalidated the jurisdictional grant of authority under 28 U.S.C. § 1471.[1] On April 23, 1981, this Court issued an Order concluding that the delegation of authority in 28 U.S.C. § 1471 to the Bankruptcy Judges empowering them to try cases which are otherwise relegated under the Constitution to Article III judges is an unconstitutional delegation of authority. Supplementing its Order, the Court makes the following Findings of Fact and Conclusions of Law.

### I. Facts

On March 8, 1979, respondent, Northern Pipeline Construction Co. (Northern) instituted a lawsuit against petitioner, Marathon Pipeline Company (Marathon) under 28 U.S.C. § 1332 in the United States District Court for the Western District of Kentucky, for claims arising out of a contract between the parties involving the construction of pipelines in Kentucky. That case is still pending. On January 14, 1980, Northern filed a petition for reorganization in the United States Bankruptcy Court for the District of Minnesota. On March 25, 1980, Northern initiated an adversary proceeding, against Marathon, under the Bankruptcy Code, asserting the same breach of contract claims asserted in its suit before the United States District Court for the Western District of Kentucky.[2] Marathon responded to this later complaint by filing a motion requesting an Order of the bankruptcy court dismissing the adversary proceeding for lack of jurisdiction. The bankruptcy court denied Marathon's motion to dismiss on November 17, 1980. Eleven days later Marathon filed an application for leave to appeal to this Court the bankruptcy court's order upholding its grant of jurisdiction under 28 U.S.C. § 1471. Marathon continued to press its claim that the bankruptcy court lacked the jurisdiction over the action for breach of contract as it involved an exercise of "the Judicial Power of the United States" which may be exercised solely by tenured judges as provided by Article III of the United States Constitution. This Court holds that 28 U.S.C. § 1471 is an unconstitu-

---

1. Pursuant to 28 U.S.C. § 2403(a), Bankruptcy Judge John J. Connelly notified the Attorney General of the United States of this challenge to the constitutionality of 28 U.S.C. § 1471 as enacted by Public Law 95–598 (the Bankruptcy Reform Act) on November 6, 1978. The government was represented at the proceeding during which this Court decided to consider the merits of the appeal by an Assistant United States Attorney for the District of Minnesota. At that hearing, both parties and the government agreed to let the Court proceed without further argument on the merits and decide the matter in reliance on the briefs and memoranda already filed in the District Court or Bankruptcy Court, including that of the United States. In concluding that 28 U.S.C. § 1471 is an unconstitutional delegation of jurisdiction to an Article I Court, the Court has in fact considered the positions of all three entities.

1. Pub.L.No.95–598, tit. II, 92 Stat. 2549 (1978).

2. Northern did omit a claim for relief based upon an alleged mechanics lien.

tional delegation of Article III judicial power to nontenured judges.

## II. *Jurisdiction and Powers*

■ 28 U.S.C. § 151(a) creates the new bankruptcy courts as adjuncts to the federal district courts, and correspondingly, bankruptcy jurisdiction is vested by 28 U.S.C. § 1471(a) and (b) initially in the district courts. 28 U.S.C. § 1471(a) vests in the district courts "original and exclusive jurisdiction over all cases under title 11." 28 U.S.C. § 1471(b) confers on the district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11."[3] Nevertheless, the ultimate repository of this jurisdiction is not the federal district court. 28 U.S.C. § 1471(c) assigns the jurisdiction granted to the district courts by subsections (a) and (b) to the bankruptcy courts. This assignment or transfer of jurisdiction from the district courts to the bankruptcy courts is mandatory, as the bankruptcy courts "shall exercise all the jurisdiction [so] conferred." Thus, the statutory scheme is constructed in such a manner as to remove with one hand what was just previously bestowed by the other.[4]

### a. 28 U.S.C. § 1471(b) [5]

Section 1471(b) is a substantial enlargement over the grant of jurisdiction of the former bankruptcy courts. This fact was noted in the House Report to the legislation which ultimately became § 1471(b).

Subsection (b) is a significant change from current law. It grants the bankruptcy court original (trial), but not exclusive, jurisdiction of all civil proceedings under title 11 or arising under or related to cases under title 11. This is the broadest grant of jurisdiction to dispose of proceedings that arise in bankruptcy cases or under the bankruptcy code. Actions that formerly had to be tried in State court or in Federal district court, at great cost and delay to the estate, may now be tried in the bankruptcy courts. The idea of possession or consent as the sole bases for jurisdiction is eliminated. The bankruptcy court is given in personam jurisdiction as well as in rem jurisdiction to handle *everything* that arises in a bankruptcy case. (emphasis added). H.R.Rep.No.595, 95th Cong., 1st Sess. 445 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, 6400.

■ The scope of "all civil proceedings arising under . . . or related to cases arising under title 11" is amazingly broad as it encompasses claims based on both federal and state law. An attorney who handled the bankruptcy reorganization of a major supermarket chain testified as to the potential breadth of this expanded jurisdiction. Included in the supermarket's five-year reorganization were such state law claims as disputes over the validity of contracts, landlord-tenant relationships, reclamation of goods, foreclosures of security interests, and alleged torts. At the same time the bankrupt was the defendant in an action to enforce collective bargaining agreements and a title VII employment discrimination action filed in response to massive layoffs.

---

**3.** The primary distinction between the grants of jurisdiction of subsections (a) and (b) is that, while the former is original and exclusive, the latter is original but not exclusive. The non-exclusivity of jurisdiction in subsection (b) civil proceedings is a necessary corollary to the power granted in subsection (d) of section 1471, to the district court and the bankruptcy court to refrain from hearing a particular proceeding.

**4.** This legislative sleight-of-hand was a response to the perceived constitutional problems surrounding such a grant of jurisdiction to the nontenured bankruptcy court. *See* 1 Collier on Bankruptcy, ¶ 3.01 (1980).

**5.** Section § 1471 does not become effective until April 1, 1984. The new bankruptcy courts' jurisdiction during the transition period is governed by Pub.L. 95–598, Title IV § 405 (1978), which simply confers the same jurisdiction and powers as those scheduled to come into existence on April 1, 1984. Thus the same constitutional problems exist as to the jurisdiction of this interim court as exist with respect to the United States Bankruptcy Court which comes into existence in 1984. *See* 2 Collier on Bankruptcy, ¶ 201[1][d] (1980).

The trustee initiated an antitrust action against several of the supermarket's suppliers, and a securities fraud action against the parent corporation. Because each of these state and federal law disputes affected the bankrupt's assets, financial condition, and obligations, they were all "related to" the underlying reorganization proceeding and thus come within the present jurisdiction of the new courts of bankruptcy. *See* Bankruptcy Court Revision, Hearings on H.R. 8200 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary. 95th Cong., 1st Sess. 18–27 (1977) (statement of J. Stanley Shaw). It is unnecessary to dwell on the myriad other fact situations that may come to mind.[6] It is evident that 28 U.S.C. § 1471(b) and its transition counterpart extend to the new courts of bankruptcy a grant of jurisdiction that will equal, and in some instances exceed the jurisdiction of the federal district courts.[7] As Collier on Bankruptcy notes "[s]ection 1471(b) finds its analogue in 28 U.S.C. § 1331, which confers original jurisdiction upon the district courts." Collier, Bankruptcy, Appendix 1, ¶ 3.01[1][d][ii] (1980). Indeed, the only significant difference is that an Article I bankruptcy judge's cases will be in some manner "related to" an underlying bankruptcy proceeding.

b. Powers of the bankruptcy court

█ The Bankruptcy Reform Act of 1978 concomitantly expands the powers of the bankruptcy courts under 28 U.S.C. § 1481. Section 1481 states "[a] bankruptcy court shall have the powers of a court of equity, law and admiralty ...." As a court of equity the bankruptcy court has wide discretion to fashion new remedies where remedies at law are inadequate. *In re Evergreen Memorial Park Ass'n*, 308 F.2d 65 (3d Cir. 1962). As a court of admiralty the bankruptcy court has the power to sell property of an estate free of maritime liens. As a court of law the bankruptcy court has the power to award damages. Title 11 U.S.C. § 105 gives the bankruptcy court the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Under 28 U.S.C. § 1651 the bankruptcy court has the power to issue all writs necessary in aid of its expanded jurisdiction. Whereas the old bankruptcy courts were unable to hold jury trials, the new courts will have that power. 28 U.S.C. § 1480. Because specific types of contempt are not set out in the 1978 statute, as they were under the old Act, the bankruptcy courts are governed by 18 U.S.C. § 401, which allows the court "to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as (1) misbehavior of any person in its presence ... (2) misbehavior of any of its officers in their official transactions (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command." This contempt power is restricted somewhat by 28 U.S.C. § 1481, where the bankruptcy court is denied the ability to punish criminal contempts not committed in its presence or those warranting a punishment of imprisonment. Finally, the bankruptcy court is granted the power to issue a writ of habeas corpus. 28 U.S.C. § 2256. In sum, the new bankruptcy court has the power to fashion remedies at law or equity, issue writs of execution and habeas corpus, punish all civil and some criminal contempts, conduct jury trials, and enter final judgments. Except for the inability to enjoin another court and

6. As Collier on Bankruptcy states "[e]xamples of the reach of the jurisdiction of the new bankruptcy court could be multiplied *ad infinitum.* Conceptually, there is no limit to the reach of this jurisdiction, insofar as the matter involved "arises in or [is] related to" the title 11 case." 1 Collier on Bankruptcy, ¶ 3.01[1][e] (1980).

7. The jurisdiction of a court of bankruptcy under the old Bankruptcy Act was confined, essentially, to actions *in rem* and actions wherein the defendant had consented to its jurisdiction. Where the Court was deemed in possession of the debtor's property and the case involved the actual disposition of the debtor's property, the suit was heard by a bankruptcy referee as a "summary proceeding." All other matters affecting the debtor's assets were deemed "plenary" suits and were heard by a district court. *See* 1 Collier on Bankruptcy ¶ 3.01[1][b] (1980).

the limitation over certain kinds of criminal contempt, the bankruptcy court is endowed with the full array of judicial powers. The Bankruptcy Reform Act of 1978, therefore, greatly expands the jurisdiction and powers of the bankruptcy courts.

Additionally, as courts of original jurisdiction, the bankruptcy courts control their own dockets and the district courts no longer have the discretion to refer matters to referees. Yet, while the new bankruptcy judges hear virtually the same range of matters and exercise nearly identical powers as an Article III district judge, these new judges are not Article III judges but rather Article I judges. Each bankruptcy judge holds office for a term of fourteen (14) years and can be removed from office for "incompetency, misconduct, neglect of duty or physical or mental disability" by a majority vote of the judicial council of his circuit. 28 U.S.C. § 153. This is to be contrasted with the life tenure guarantee under Article III § 1 of the United States Constitution[8] and the strict impeachment standard for "high crimes and misdemeanors" under Article II § 4 of the Constitution applicable to Article III judges. Bankruptcy judges shall receive a salary of $50,000 a year with cost-of-living adjustments. 28 U.S.C. § 154. This salary, however, is unprotected, and Congress may at its discretion choose to diminish it. This is not the case with an Article III judge, whose salary is guaranteed by Article III § 1. It is the conclusion of this Court that necessarily concomitant to the increased powers, jurisdiction and independence of the bankruptcy judges are the life tenure and undiminishable salary guarantees of Article III of the United States Constitution. The creation of a court with such broad jurisdiction and power without the tenure and salary protections of Article III jeopardizes the independence of the entire judiciary.

### III. *The Bankruptcy Court is an Article I Court*

The above analysis concerning the nature of the bankruptcy court yields little more than an enumerative definition. The next step requires one to go beyond a mere listing of attributes and to inquire whether the bankruptcy court, so defined, is more appropriately characterized as an Article III court or an Article I court. This endeavor, while seemingly straightforward, is laden with uncertainty, as it requires an inquiry into the necessary and sufficient elements of an Article III court.

Chief Justice Marshall in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1928), remarked, " 'the judges both of the supreme and inferior court, shall hold their offices during good behavior.' The judges of the superior courts of Florida hold their offices for four years. These courts, then, are not constitutional courts, . . ." *Id.* at 546. *Canter* then suggests that the qualities of life tenure and undiminishable salary define an Article III court. The bankruptcy court is an Article I court under this view. The Supreme Court, however, has also held that the true test for determining whether a tribunal is an Article III or Article I court lies "in the power under which the court was created and in the jurisdiction conferred." *Ex Parte Bakelite Corp.*, 279 U.S. 438, 459, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929). Viewed in this light the bankruptcy court may be construed as an Article III court stripped of the Article III protections of life tenure and undiminishable salary rather than an Article I court vested with all the essential attributes of an Article III court. This latter interpretation clearly simplifies any constitutional analysis, as all Article III court judges must necessarily be guaranteed life tenure and undiminishable salary. Finally, the Supreme Court has emphasized that explicit evidence as to congressional intendment concerning the proper classification of a particular tribunal may be relevant and highly persuasive. *Glidden Co. v. Zdanok*, 370 U.S. 530, 542, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962). Discerning leg-

---

8. "Good Behaviour" has always been taken to mean tenure for life, with removal only according to the impeachment standard set forth in Art. II § 4. *See O'Donoghue v. United States*, 289 U.S. 516, 529–30, 53 S.Ct. 740, 742–43, 77 L.Ed. 1356 (1933).

islative intent is, at best, an endeavor giving rise to much speculation and conjecture. The House Judiciary Committee elicited responses on this very issue from a number of constitutional scholars. The majority of these experts concluded that the bankruptcy court is an Article I court. *See* H.R.Rep. No.95–595. 95th Cong., 1st Sess., 63–87 (1977). This Court, for the purposes of further inquiry, agrees that the new bankruptcy court is an Article I court.[9]

IV. *Constitutional Issues*

a. Separation of powers

The basic concept encompassed by the doctrine of separation of powers is relatively straightforward. The Constitution explicitly enunciates what powers of the federal government are granted to which of three branches: i. e., the legislature, the executive and the judiciary. The doctrine of the separation of powers requires that "a power definitely assigned by the Constitution to one department can neither be surrendered nor delegated by that department, nor vested by *statute* in another department of agency." *Williams v. United States*, 289 U.S. 553, 580, 53 S.Ct. 751, 760, 77 L.Ed. 1372 (1933). While recent authority suggests that *Williams'* rather rigid interpretation of the doctrine has softened, *Palmore v. United States*, 411 U.S. 389, 397–408, 93 S.Ct. 1670, 1676–82, 36 L.Ed.2d 342 (1973); *Glidden Co. v. Zdanok*, 370 U.S. 530, 549–51, 82 S.Ct. 1459, 1472–73, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.), there can be no doubt that there exists a limit to Congress' power to create Article I tribunals and vest them with Article III jurisdiction and power. *Murrays Lessee v. Hoboken Land and Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855); *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *O'Donoghue v. United States*, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933). The Court through Chief Justice John Marshall recognized that there are some matters which may be performed only by one branch of the government. It also noted that the boundaries separating one branch from another and the line delineating the powers of one branch from another "is a subject of delicate and difficult inquiry . . . ." *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 46, 6 L.Ed. 253 (1825). It is to that inquiry that this Court now turns.

Congress, under U.S. Constitution Article I, § 8, clause 4, has the authority "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." Clause 18 of the same section gives Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ." This is similar to Congress' plenary power to legislate for the District of Columbia conferred by Article I, § 8, clause 17, which enabled Congress to select the appropriate court, whether it is created by virtue of Article III or Article I, to hear and determine particular criminal cases within the District. *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). The Court of Customs Appeals "was created by Congress in virtue of its power to lay and collect duties on imports and to adopt any appropriate means of carrying that power into execution" under Article I, § 8, clauses 1 and 18 of the Constitution. *Ex Parte Bakelite Corp.*, 279 U.S. 438, 458, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929). The military courts are legislative courts created under Congress' authority to "make Rules for the Government and Regulations of the land and naval Forces." Article I, § 8, clause 14; *Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

█ The constitutional basis for the jurisdiction of the new bankruptcy court is, then, not unlike that of many constitution-

---

9. It must be kept in mind that while many Article I tribunals, such as the Court of Claims, the Court of Customs and Patent Appeals (both now Article III courts 28 U.S.C. § 171 and 28 U.S.C. § 211), the late Court of Private Land Claims, the Consular courts, the Military Courts, the Superior Court of the District of Columbia, and the Courts of Bankruptcy are called courts, they are in reality agencies of the legislative or executive branch. *Glidden Co. v. Zdanok*, 370 U.S. 530, 599, 82 S.Ct. 1459, 1498, 8 L.Ed.2d 671 (1962) (Douglas, J., dissenting).

ally valid Article I courts. Yet, an examination of these other Article I tribunals will reveal that they are much more limited courts, whose jurisdictions are restricted to discrete and specialized areas. The new courts of bankruptcy, on the other hand, are Article I courts—legislative agencies—that are completely independent of the judiciary with a jurisdictional reach as great and at times greater than that of the district courts.

### b. Judicial power

The first Supreme Court pronouncement on the distinction between Article III (constitutional) courts and Article I (legislative) courts came in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828), where Chief Justice Marshall stated that legislative courts are "incapable of receiving" judicial power. *Id.* at 546. Clearly, the 1978 Bankruptcy Reform Act cannot be considered a constitutional delegation of authority given this precedent,[10] unless one claims that all the cases that might arise under the bankruptcy court's expanded jurisdiction fall without Article III judicial power and are solely an outgrowth of Congress' power under Article I to enact bankruptcy legislation.[11]

As with most issues in this area confusion abounds over the question whether bankruptcy cases under the 1978 Act can be considered Article I cases, or whether they are now encompassed within the Article III "judicial power." Justice Story in *Mitchell v. Great Works Milling and Mfg. Co.*, 17 F.Cas. 497, 499 (C.C.D.Me.1843) (No. 9662), made the following observation concerning the congressional power to confer jurisdiction on the district courts in plenary suits:

To us it seems perfectly clear, that Congress possess a complete constitutional authority to enact such a law for such an object; for the judicial power, by the constitution, extends "to all cases in law and equity, arising under the constitution and the laws and treaties made, or which shall be made under their authority," and further Congress are authorized "to pass uniform laws on the subject of bankruptcies throughout the United States." The Judicial power has, in this respect, under the constitution, always been construed to be coextensive with the legislative powers, upon the plain ground, that the constitution meant to provide ample means to accomplish its own ends by its own courts.

Clarity, however, had faded somewhat over the century resulting in *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949), where Justice Jackson argued that the jurisdiction of plenary suits arising out of bankruptcy proceedings was conferred upon the courts in an exercise of authority under Article I. *Id.* at 594, 69 S.Ct. at 1178. Nevertheless, this view of Article I power was rejected by six members of the Court. Justice Frankfurter, reasoning in much the same manner as Justice Story in *Mitchell*, stated:

[I]n the exercise of its power to "pass uniform laws on the subject of bankruptcies" Congress may deem it desirable that the federal courts be utilized for all the claims that pertain to the bankrupt estate whether in the federal court in which the bankruptcy proceeding is pending or in a more convenient federal court. The congeries of controversies thus brought into being by reason of bankruptcy may be

---

10. *Canter* indicates that within the states, admiralty cases, which are not cases "arising under the laws and Constitution of the United States," but, nevertheless, are a form of Article III judicial power, cannot be tried by legislative courts. *Id.* at 544–46. Thus the valid exercise of admiralty jurisdiction by the bankruptcy court is cast in doubt. *See also National Mutual Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 644, 69 S.Ct. 1173, 1208, 93 L.Ed. 1556 (1949) (Vinson, C. J., dissenting).

11. Interestingly, this approach has its own constitutional problems. If all cases and proceedings arising under title 11 arise as a result of the exercise by Congress of its legislative (Article I) powers, then 28 U.S.C. § 1471(a) and (b) which vest original jurisdiction of all cases under title 11, and all civil proceedings arising under or "related to" title 11 in the district courts, are an unconstitutional delegation of Article I power to an Article III tribunal.

lodged in the federal courts because they arise under "the Laws of the United States," to wit, laws concerning the "subject of bankruptcies." It is a matter of congressional policy whether there must be a concourse of all claims affecting the bankrupt's estate in the federal court in which the bankruptcy proceeding is pending or whether auxiliary suits be pursued in other federal courts.

*Id.* at 652, 69 S.Ct. at 1198. This Court, following Justice Frankfurter's reasoning, agrees with Justice Rutledge's remark in *Tidewater* that "federal court adjudication of disputes arising pursuant to bankruptcy and other legislation is conventional federal question jurisdiction." *Id.* at 611, 69 S.Ct. at 1187.

Thus, the 1978 Act by eliminating the summary-plenary distinction and bestowing all jurisdiction relating to bankruptcy to the courts of bankruptcy has transferred Article III judicial power to an Article I tribunal. Indeed, it is the opinion of this Court that as jurisdiction to hear "all Cases, in Law and Equity, arising under this Constitution, the laws of the United States ...," Article III, § 1, is judicial power and as the 1978 Act vests in the courts of bankruptcy a nearly identical jurisdictional reach, there is little doubt that such courts exercise Article III judicial power. To hold otherwise is to turn "judicial power" into some curious metaphysical concept dependent alone for its existence upon the particular forum in which a controversy is heard. Clearly, "judicial power" is more than just a label attached to certain tribunals and not to others. It is shorthand for the class of those powers uniquely resident in the judicial branch of the federal government. Jurisdiction, the power to hear and decide a broad range of cases and controversies, is perhaps the most important aspect of judicial power.[12] The remaining question then

becomes: Does 28 U.S.C. § 1471 confer an unconstitutional amount of judicial power upon the Article I bankruptcy court?

In *Ex Parte Bakelite Corp.,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), the Supreme Court discussed at length a number of constitutionally valid Article I courts. The Court of Private Land Claims' "special function was that of hearing and finally determining claims founded on Spanish or Mexican Grants ...." *Id.* at 456, 49 S.Ct. at 415. The Choctaw and Chickasaw Citizenship Court was created to hear and determine controverted claims to membership in two Indian tribes. *Id.* at 457, 49 S.Ct. at 415. The Court of Claims was created "as a special tribunal to examine and determine claims for money against the United States." *Id.* at 452, 49 S.Ct. at 414. Claims against the government were traditionally handled by either Congress itself or some executive departments. These matters included "nothing which inherently or necessarily require[d] judicial determination." *Id.* at 453, 49 S.Ct. at 414. Similarly, the Court of Customs Appeals, whose function was to review the acts of appraisers and collectors in appraising and classifying imports, was exclusively involved in matters "susceptible of performance by executive officers and had been performed by such officers in earlier times." *Id.* at 458, 49 S.Ct. at 416.

The bankruptcy court is unlike any of these four courts. Its jurisdiction is by no means as narrow; and the bankruptcy court, by taking jurisdiction over plenary suits traditionally heard by the district courts, inherits through the new code a traditional judicial function.

In *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), the Supreme Court upheld legislation which authorized an administrative agency to determine workman's compensation claims, i. e. private rights arising under federal law, sub-

---

**12.** Chief Justice Marshall left no doubt that "it is emphatically the province and the duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Note also, "An administrative officer in the discharge of his duties may have occasion to interpret and apply a law in order

to enforce it, but he can have no such occasion in order to determine the rights of private litigants, since he may not be constitutionally authorized to take jurisdiction in respect to them." *Opinion of the Justices.* 87 N.H. 492, 495, 179 A. 344 (1935).

ject to appellate review in an Article III court. *Crowell* does not mean that Congress can create legislative courts to hear any federal question as long as appellate review in an Article III court is available.[13] Such an interpretation renders meaningless the established fact that the life tenure and salary provisions of Article III apply with equal force to all levels of the judiciary. Furthermore, the language of *Crowell* fails to support such an interpretation. The opinion merely states that "there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts be made by judges." *Id.* at 51, 52 S.Ct. at 292. The Court goes on to state that "[t]he statute has limited application, being confined to the relation of master and servant, and the method of determining the questions of fact, which arise in the routine of making compensation awards to employees under the Act, . . . ." *Id.* at 54, 52 S.Ct. at 293. Indeed the Court explicitly recognizes a limitation upon Congress' power to confer judicial power upon non-Article III tribunals, remarking:

> The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the Executive Department. That would be to sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our system.

*Id.* at 56–57, 52 S.Ct. at 294–95.

The 1978 Bankruptcy Reform Act is hardly a statute of limited application. The bankruptcy court's jurisdiction will cover the entire range of state, federal, and constitutional law. The affairs of insolvent men are no less diverse than the affairs of men of more substantial means. Indeed no class of individuals needs the protections of an independent judiciary more than the bankrupt. The powers of the bankruptcy court far outstrip those of any administrative agency. It acts with the power and prestige of a federal court but without the commensurate degree of independence. It is this very notion of independence that lies at the heart of the doctrine of separation of powers.

The most recent Supreme Court treatment of this issue is *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), where the constitutionality of the District of Columbia's local court system was upheld. The Court rejected Palmore's claim that, as a defendant in a criminal proceeding arising under the laws of the United States,[14] he was entitled to be tried by an Article III judge. Congress, the Court remarked, exercised its power under Article IV to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" when it created the District's local court system. *Id.* at 402, 93 S.Ct. at 1679. The Court went on to state:

> It is apparent that neither this Court nor Congress has read the Constitution as requiring every federal question arising under the federal law, or even every criminal prosecution for violating an Act of Congress, to be tried in an Art. III court before a judge enjoying lifetime tenure and protection against salary reduction. Rather, both Congress and this Court have recognized that state Courts are appropriate forums in which federal

---

**13.** In *Glidden v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), the Supreme court held that Congress could not authorize the judges of a legislative court to sit by designation on an Article III court even though appellate review by an Article III tribunal was available.

**14.** Section 22–3204 of the District of Columbia Code (1967) makes it a felony to carry an unregistered handgun in the District of Columbia.

questions and federal crimes may at times be tried; and that the requirements of Art. III, which are applicable where laws of national applicability and affairs of national concern are at stake, must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment. *Id.* at 407–08, 93 S.Ct. at 1681. Congress then may confer upon non-Article III tribunals a limited amount of judicial power, i. e., the power to try cases arising under federal law in specialized areas having particularized needs and warranting distinctive treatment.

The Supreme Court makes clear the kind of tribunal the phrase "specialized areas" denotes. The local District of Columbia court system is "designed primarily to concern itself with local law and to serve as a local court system for a large metropolitan area." *Id.* at 408, 93 S.Ct. at 1681. The jurisdiction conferred on these courts is to try "cases arising under the District of Columbia Code and other matters of strictly local concern." *Id.* at 407, 93 S.Ct. at 1681. Thus, the local district courts function much like the state courts and virtually no state has found it necessary to provide for tenure during good behavior. *Id.* at 409, 93 S.Ct. at 1682. The Court simply treats the District of Columbia as a state. To do otherwise would clog the District's Article III courts with matters of local concern, thereby inhibiting those tribunals from doing the work they were designed to do, namely, to try cases arising under the Constitution and the nationally applicable laws of Congress.[15] The Supreme Court suggests that Congress' power to legislate with respect to "specialized areas" is limited to discrete geographic areas. *Id.* at 402–03, 93 S.Ct. at 1678–79. *Palmore*, in this sense, returns full-circle to *American Insurance Co. v. Canter*, 1 Pet. 511, 26 U.S. 511, 7 L.Ed. 242 (1828). In *Canter*, the Court upheld Congress' power under Article I § 8 to establish Territorial

Courts in Florida and vest them with admiralty jurisdiction. Congress could not, however, create an Article I court in any of the states and vest it with such jurisdiction. 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828). While *Canter* is an unclear statement concerning the nature of judicial power insofar as it suggests that admiralty jurisdiction in one locality is not judicial power and in another it is, it clearly indicates that congressional power to confer such jurisdiction upon Article I tribunals is limited to distinct geographical areas.

Even if the concept "specialized areas" is not so limited, but also encompasses specialized subject matters, the new bankruptcy court's jurisdiction is an unconstitutionally broad delegation of judicial power. A wholesale transfer of Article III court jurisdiction cannot be constitutionally sanctioned simply because the recipient has unique responsibility over a particular subject matter. *Palmore*, therefore, holds only that Congress may confer a limited amount of judicial power on non-Article III tribunals where laws of national applicability and affairs of national concern are not at stake.

The bankruptcy court's jurisdiction is broad enough to concern it with laws of national applicability and affairs of national concern. The bankruptcy court's powers are not significantly different than those of the district court. As the House Judiciary Committee remarks:

The bankruptcy court's general jurisdiction and broad judicial powers make it a true court, unlike specialized administrative tribunals. To the extent that it is a specialized forum, its specialization is unlike that of the Tax Court, where primarily issues under the Internal Revenue Code are decided; or of the Customs Court, or Court of Customs and Patent Appeals, where the range of issues is similarly limited. The nature of the work of the bankruptcy court militates strongly toward its establishment under Article III, because the bankruptcy law

**15.** *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), held the

Supreme Court and the Court of Appeals of the District of Columbia to be Article III courts.

itself and the jurisdiction the court must exercise are "of national applicability." H.R.Rep.No.95–595, 95 Cong., 1st Sess. 32 (1977).

In sum, the delegation of authority in 28 U.S.C. § 1471 to the bankruptcy judges to try cases which are otherwise relegated under the Constitution to Article III judges is not analogous to the jurisdiction conferred by Congress upon other Article I courts. Title 28 U.S.C. § 1471 cannot be sustained as a valid exercise of Congress' power under Article I, § 8, cl. 4, to establish a uniform bankruptcy law. Rather, § 1471 is an unconstitutional delegation of Article III judicial power to a nontenured Article I court.

## V. *Conclusion*

One of the main reasons for reforming the bankruptcy court system was that under the old "referee" system the bankruptcy court was not truly and completely a court. It was not independent but had to operate under the supervision of a district court. This lack of independence hampered the bankruptcy court's operation both administratively and substantively. H.R.Rep. No.95–595, 95th Cong., 1st Sess. 4 (1977).

One wonders, however, what measure of independence is gained through a court system that calls for its judges to sit for a limited number of years constantly under the threat of removal from office by a majority vote of their judicial brethren and open to possible retaliation in the form of salary cuts from Congress. Indeed, vesting such a precariously situated court with nearly the full panoply of district court jurisdiction and power effectively denies every litigant tangentially connected with a bankruptcy an independent and impartial forum in which to have his dispute resolved, regardless of the nature of his dispute. In turn, as a significant number of cases and controversies are removed from the sphere of Article III court determination, upon the theory that Congress has the authority to legislate in a certain subject area, the independence of the entire judicial branch is compromised. For the bankruptcy power is no different in this respect than the power to regulate commerce or any other source of national legislation. *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 86 (1977) (letter of Herbert Wechsler).

Our system of government is designed in such a manner that it requires the cooperation of two or more branches of the government to inhibit personal liberties. The Framers of our Constitution were aware that tyranny lies in the unaccountable exercise of government power. Each governmental branch serves as a check against the abusive use of power by the others. The tenure and salary provisions of Article III are crucial to an independent judiciary:

> Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. The remark made in relation to the President is equally applicable here. In the general course of human nature a power over a man's subsistence amounts to a power over his will; and we can never hope to see realized in practice the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter.

The Federalist No. 78 (A. Hamilton). The creation of a court system vested with broad federal question jurisdiction without the guarantees of life tenure and undiminishable salary disrupts the delicate balance of power in our federal system giving rise to the possibility of a lessening of our personal freedoms.[16]

---

**16.** The tenure and salary protections in Article III are also important in the bankruptcy context, because by ensuring judicial independence they limit the extent to which the political branches of the federal government can encroach upon state-created rights through the use of Article I tribunals.